## THE PEOPLE *v.* THE BOARD OF SUPERVISORS OF THE COUNTY OF LIVINGSTON.

When, by resolution of the board of supervisors, it is resolved to issue the bonds of the county to each supervisor, and that the board assess the amount of the bonds called for by each supervisor on the town he represents, *held,* that the money to be raised upon such bonds was raised upon the credit of the county.

That the board of supervisors had no authority to raise money upon the credit of any town, except upon a vote of a majority of the electors of such town present and voting at an annual town meeting, or at a meeting called for that purpose.

CERTIORARI for the review of certain proceedings of the defendants, hereinafter mentioned, relating to bounties to volunteers mustered into the military service of the United States.

On the 3d day of August, 1864, the defendants, at a special session, passed a resolution providing for the issuing of county bonds to each supervisor of the county that might call for the same, or borrow money on said bonds for such supervisors as might call for money, to pay a bounty, not exceeding a certain sum, to each recruit that should be mustered into the service of the United States, to the credit of their respective towns — each supervisor to be recruiting and disbursing agent for his town, and to draw such an amount from the treasury as would pay for filling the quota of his town ; and that, in the payment of said bonds, the defendants assess such sums on the towns respectively, in proportion to the amount of bonds or money taken by each town.

On the 2d day of September, 1864, at a special session, the defendants passed a resolution, that each town in the county of Livingston be authorized to increase its bounty to a sum not exceeding $1,000 ; and that the treasurer of the county be authorized to issue county bonds, as each supervisor might call for them, subject to the regulations prescribed by resolutions of the defendants, passed August 3d, 1864.

Bonds were issued in pursuance of these resolutions to the supervisors respectively of the several towns, to the amount of $764,507.

On the 30th of November, 1864, at a regular annual session, the defendants passed resolutions that there be assessed, levied and collected, upon the taxable property of the county of Livingston, as other county taxes are assessed, levied and collected, a sum equal to the amount that would become due on the bonds, on the 1st of February, 1865, in order to pay that portion of the bonds.

The General Term of the court in the 7th district, after argument and consideration, on the 22d of March, 1865, ordered judgment for the respondent, and affirming the resolutions of the defendants of the 30th of November, 1864, with costs; and on the 17th of May, 1865, judgment was entered.

From that judgment the relator appeals to this court.

*George F. Danforth* and *Scott Lord*, for the appellant (the relator).

*T. R. Strong*, for the respondents.

PECKHAM, J.    The certiorari in this case, I incline to think, was issued improvidently. It was issued upon the application of the relator, a citizen and tax-payer of the county of Livingston, to review a resolution adopted by the defendants, the supervisors, on the 30th of November, 1864, whereby they ordered that a certain amount should be assessed, levied and collected upon the taxable property of the county to pay certain county bonds, issued for the payment of bounties to volunteers to fill the quota of said county, "under the call of the President for 500,000 men, July 18th, 1864." The relator insists that that assessment was irregular and unauthorized; that it should have been assessed upon the different towns in proportion to the amount of said bonds taken by each town. What interest the relator has in the question, or where it lies, does not clearly appear. He insists, however, that his interests will be injuriously affected

thereby; that he will be compelled to pay a larger sum (how much larger, whether one dollar or five, does not appear), by this county assessment than if it had been imposed on the towns in the proportion before mentioned.

It is difficult to distinguish this case in principle from that of *The People* v. *The Supervisors of Allegany* (15 Wend., 198.) There the relator insisted that large amounts were irregularly and improperly included in the assessment, to his prejudice as a tax-payer. The court, after return made to the writ, full argument and deliberate consideration, quashed the writ as improvidently issued (see, also, *The People* v. *The Supervisors of Queens*, 1 Hill, 194), because of the great public inconvenience necessarily involved, and because of the impropriety in this case of determining questions materially affecting the rights of bond-holders when they are not parties.

Besides, if this assessment is made without authority, or contrary to law, the relator has his legal remedy, though it may be of doubtful practical benefit. As to the merits of the question involved, if we look at them, the statute authorized boards of supervisors "to adopt resolutions to provide for raising money upon the credit of their respective counties for the use of said county, or upon the credit of any city or town thereof for the use of said city or town," &c., "but no such money shall be raised upon the credit of any town except upon a vote of a majority of the electors of said town, present and voting at an annual town-meeting, or at a meeting called for that purpose," &c., and all such taxes imposed by a vote of such electors upon any town, shall be levied by such board of supervisors upon the taxable property of said town and collected, &c. (Laws of 1864, p. 24; § 22.)

Did the defendants here ever make provision for raising money upon the credit of any town of their county for the use of said town? I think not. It is entirely clear that they proposed to raise this money upon the credit of the county, and not of any town, upon bonds of the county, thus creating a debt of the county. The resolution of the 22d of July, 1864, was, to "issue the bonds of the county to each supervisor, and that the board assess the amount of the

bonds called for by each supervisor on the town he represents."

This was modified by resolutions of 2d of August. Thereby "each supervisor to be recruiting and disbursing agent for his respective town."

Neither resolution referred to any action of any town through its town meeting, or purported to be based upon any such action.

The purpose of the board seemed to be to make a county debt, to raise the volunteers required and then charge the towns with the amount they severally received of the county bonds, irrespective of any action of the voters of the town.

Clearly this did not bind the several towns. I think it did the county under that act. If not under that, it did under an act of the same session, p. 111, which made all such bonds valid and obligatory.

It being a valid debt against the county, it was clearly lawful and proper for the defendants to assess and collect the amount from the taxable property of the county.

There is no room here for presuming that the towns voted in favor of receiving these bonds, or of assuming a liability to pay them, because they do not purport to have been issued upon any such basis, nor were they the debts of the towns which the act authorized the voters to assume.

It is insisted that these bonds could not have been issued for the use of the county — that towns, and not counties, were, by act of congress, military sub-districts, and the acts of congress are referred to to sustain this nice distinction.

The answer is, the legislature of this State, under whose authority these bonds were issued, obviously acted under a different impression as to their use, as they authorized the issue of these bonds by the county "for the purpose of paying bounties to volunteers into the military or naval service," &c.

This action of the defendants may operate to the prejudice of some towns richer in money than in men; still, that can scarcely be regarded as an unjust rule that compels men to contribute to patriotic purposes according to their means.

Judgment should be affirmed, with costs.

DAVIES, Ch. J.  The proceeding in this action is by a writ of certiorari to review the action of the board of supervisors of the county of Livingston, of the 30th of November, 1864, by which a tax was imposed and directed to be collected upon the real and personal estate situated in said county. The resolution directed the sum of $133,476 to be levied and collected for the purpose of paying the principal and interest of certain bonds issued by said county for paying bounties under the act of the legislature of this State, passed on the 9th day of February, 1864, falling due and payable in the year 1865.  Waiving the question as to the propriety of issuing a certiorari to review and set aside a tax in the process of collection, we will proceed to an examination of the main question presented and urged in the argument, namely, the authority of the board of supervisors to levy and direct the tax in question.  The act above referred to (Laws of 1864, pp. 12, 24, § 22), authorizes and empowers the board of supervisors of the several counties of this State "to adopt resolutions to provide for raising money upon the credit of their respective counties for the use of the county, or upon the credit of any town for the sole use of the town, or to levy and impose a tax upon the taxable property of the county for the use of the county, or upon any town for the sole use thereof, for the purpose of paying bounties," &c.; but also declaring that "no such money should be raised upon the credit of any town, nor any tax for money, to be raised upon the credit of any town, be levied and imposed, except upon the vote of a majority of the electors of such town."  And also declaring "that the taxes so imposed should be levied by the supervisors upon taxable property of the town."

The extent of the moneys to be raised, depended, of course, upon the number of men to whom the bounties were to be paid, and the amount of such bounties.  Each town in a county had assigned to it its quota or number of men required, and the total of all the assignments to the several towns of a county was the aggregate required from any given county.  The legislature, therefore, authorized the several

boards of supervisors to adopt the needful ways and means to furnish the men, called for from any particular county, by the payment of bounties or otherwise. To this end four distinct and independent methods might be adopted.

1. The supervisors might borrow the money upon the credit of the county, for the use of the county. The obvious meaning of this is, an authority to borrow such an amount upon credit as the exigencies of the county might require for the purposes of the act.

2. To borrow upon the credit of every town of the county, for the sole use of the town, such money as it might expend for the purposes of the act. The meaning of this clearly is, that if the towns should undertake separately to fill their respective quotas, the board of supervisors had the authority to borrow upon the credit of the town, for its sole and separate use, such sum as might be required. Under this authority it is apparent that the money was to be raised upon the credit of the town, and upon the bonds of the town. No other town in the county could be made liable for their payment, and only the taxable property of that particular town was subjected to be levied on for the payment.

3. Instead of borrowing money upon credit, the supervisors were authorized to levy and impose a tax upon the taxable property of their respective counties, for the use of the county, for such amount as they might require for the purposes of the act; or,

4. If they should deem it expedient, they might levy and impose a tax for any amount which any town in their county might require or expend for the purposes of the act upon the taxable property of any town.

But the act made it a condition precedent to the exercise of the authority conferred to borrow money upon the credit of any town, or to levy and impose a tax upon any town, that the same should be first authorized by a vote of the majority of the electors of said town, present and voting at an annual town meeting, or at a special meeting called for that purpose. We may dismiss from further consideration these provisions relating to the liability of towns, as it is not

claimed or pretended that any money has been borrowed upon the credit of any town, by the issue of town bonds, or any tax levied upon any town in pursuance of the authority thus conferred. If any such attempt had been made, no legal debt against any town would have been created, as it does not appear that any of the towns had previously authorized it by a vote of a majority of its electors, as required by the statute. (*Starin* v. *Town of Genoa*, 23 N. Y., 439; *Gould* v. *Town of Sterling*, id., 439.)

The money in the present instance was raised upon the credit of the county for the use of the county, and the taxable property of the county is liable for its reimbursement. Before any action was taken under the act of February 9, 1864, the legislature, on the 26th of March, 1864 (chap. 72, Laws of 1864), amended this act by declaring that every county in this State is hereby declared liable to pay all money which shall hereafter be borrowed in pursuance of the votes, resolutions or directions of the board of supervisors of such county, for the purpose of paying bounties, &c.; and every such bond, certificate or other instrument, which shall be issued in pursuance of such votes, resolutions or directions, for money which shall be so borrowed for the purposes aforesaid, was thereby declared to be valid. And such board was authorized to cause money to be raised from time to time upon the taxable property of such county, to pay the money so borrowed, and the interest thereon, when the same shall become payable. If, therefore, there was any irregularity in the issue of these bonds, it was cured by this statute. But I do not understand that any serious question is made on that ground; but it is claimed that in the resolutions of August and September, 1864, certain stipulations, agreements or conditions were inserted, that made the moneys so borrowed town charges, and that, therefore, the same were to be assessed and collected upon the several towns of the county in proportion to the amount expended by each town for the purposes of the act. It is true that the resolution of August 2, 1864, contained a stipulation or declaration that "on the payment of said bonds, the board of supervisors

assess such sum on the towns respectively in proportion to the amount of bonds or money taken by each town through its supervisor, and that each supervisor shall indicate to the treasurer the length of time the bonds are to run for his town, and said bonds shall be issued in accordance with said indication." And in the resolution of the board of supervisors of September 2, 1864, authorizing an increase of the bounties to be paid, it was declared that "the treasurer of the county be authorized to issue county bonds as each supervisor may call for them, subject to the same regulations as prescribed by the resolutions of this board passed August 2d, 1864." The resolution of August 2d only authorized the treasurer to issue the bonds of the county.

It is now urged that by the terms of these resolutions the bonds issued were issued upon the credit of the several towns, and that each town should only be taxed for the payment of such bonds as were issued and delivered to its supervisor. We look in vain in the statute for any power conferred on the board of supervisors to authorize its treasurer or any one else to issue bonds for the various towns of the county; in other words, that the bonds issued become the debts of the several towns, and not the debt of the county. There are many fatal objections to this position; and as it lies at the foundation of the appellant's claim, its disposition is decisive of his appeal.

1. All the bonds issued, under both resolutions, were denominated, and were in fact, county bonds. It was only such bonds that the treasurer was authorized by the board to issue, and the board had no power to authorize him to issue town bonds, upon the credit of, and to be paid by, said towns respectively. They could authorize the several towns to raise money upon credit for their sole use respectively, but no such money could be raised upon the credit of any town until authorized by a majority of the electors thereof at an annual or special town meeting. Now it is giving a forced and unnatural construction to these resolutions to contend that they authorized the several towns to raise money upon their credit for the purposes of the act. There

was nothing inconsistent with the spirit and intent of the act that only so much money should be raised as was necessary to meet the expenses incurred in each town for filling its quota. Nor was there any impropriety in delivering to the supervisors of the respective towns bonds of the county to an amount equal to the expenditure of the towns respectively. It would hardly have been urged, if the county treasurer had himself negotiated the bonds and paid over to the supervisor of the town the requisite amount of money, that the money so paid became a debt of the town. Neither would this fact, or the circumstance that the supervisor of the town to whom bonds were to be delivered was to designate the time the bonds were to run, change their character from county bonds to that of town bonds. It cannot be supposed that the board would have attempted to create a debt on the credit of the respective towns in this bungling manner. The attempt, if made, has wholly failed, because none of the steps required by law have been taken to raise money upon the credit of the towns. But the measures pointed out by the statute to raise money upon the credit of the county have been legally pursued, and the bonds issued have created a county debt, and the towns, as an integral part of the county, are bound to contribute to its discharge. The taxable property of the county, without any reference to town lines, is made subject by law to be levied upon from time to time, to pay the money so borrowed and the interest thereon. The declaration in the resolution of August 2d, that in payment of said bonds the board of supervisors should assess the amounts paid to each supervisor upon the towns respectively, for which the sum was received by him, was not only wholly unauthorized but in direct conflict with the provisions of the acts of February 9th and March 26th, 1864. The latter act expressly declared that it should be the duty of the respective boards of supervisors of this State to cause money to be raised, from time to time, upon the taxable *property of the county*, to pay the money so borrowed, and the interest thereon, as the same should become due and payable. It was to be collected from the taxable property of the

county, equally, and without reference to town lines or other subdivisions. No discrimination was authorized to be made between the several towns. The property subject to taxation of the whole county was compelled to contribute to the payment of the county debt, as the property of all the counties of the State are equally compelled to contribute to the payment of the debts of the State, in proportion to the amount of their taxable property. The statute made no discrimination, and it was not in the power of the board of supervisors to make any. If the supervisors thought they could make it when they passed the resolutions of August 2d and September 2d, they were entirely mistaken, and such parts of these resolutions as point to such a result must be rejected as surplusage. When, therefore, the board of supervisors passed the resolution of November 30, 1864, which it is sought by this proceeding to have reversed and set aside, they had a correct appreciation of their powers and duties, and but followed the injunctions of the act of March 26, 1864. The resolution was in these words : " Resolved, that there be assessed, levied and collected upon the taxable property of the county of Livingston, the sum of $133,476, to be applied by the county treasurer to the payment of the Livingston county bonds falling due in February, 1865, issued for the payment of bounties to volunteers to fill the quota of Livingston county under the call of the President for 500,000 men, July 18th, 1864, and that the same be assessed, levied and collected the same as other county taxes are assessed, levied and collected."

2. The bonds issued, as it has been shown, were county bonds. They created a county debt, and that debt was, by law, to be levied upon and collected from the taxable property of the county, and the supervisors, therefore, correctly directed that it should be so assessed, levied and collected. The statute whereby the debt was created made no discrimination, in imposing the burden of paying it, upon the property of different towns. They are not recognized, in the statute, as bodies to contribute to the payment of this debt. It is the taxable property of the county which is liable to pay, and it must pay equally, without reference to its location within this or that

particular town.   It is for the legislature to provide against any inequalities or injustice which may flow from the tax being equally distributed upon all the property located within the borders of the county.   The courts are powerless to correct any such hardships, if they exist, in the present case. Being of the opinion that the resolution of November 30, 1864, directing the mode and manner of assessing, levying and collecting the moneys needful to pay the debt falling due, was in strict conformity with the provisions of law, I am in favor of affirming the judgment, with costs.

All the judges concurring,

Judgment affirmed, with costs.